MORRISON TENNENBAUM, PLLC
87 Walker Street, Second Floor,
New York, NY 10013
Telephone: (212) 620-0938

HEARING DATE: January 10, 2023
HEARING TIME: 10:00 a.m.

Proposed Attorneys for Symbiont.io LLC,

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------
-X

In re:

**SYMBIONT.IO LLC,**

                Debtor.
---------------------------------------------------------
-X

Chapter 11

Case No. 22-11620-PB

**APPLICATION IN SUPPORT OF AN ORDER DISMISSING CHAPTER 11 CASE**

TO:   **THE HONORABLE PHILIP BENTLEY UNITED STATES BANKRUPTCY JUDGE**

The above-captioned debtor (the "Debtor"), by their undersigned counsel, submits this application (the "Application") in support of an Order pursuant to §1112(b) of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 1017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), dismissing this Chapter 11 case and respectfully represent and allege:

**FACTUAL BACKGROUND**

1.   Symbiont is the market- leading smart contracts platform for institutional applications of blockchain technology, developing products in smart contracts and distributed ledgers for use in capital markets.  Through the Symbiont Assembly blockchain platform, Symbiont works with its clients to build and run decentralized applications involving the

blockchain, called "smart contracts," that permit financial institutions to use the block chain to create a more robust and secure golden record of its financial transaction.

2.  Symbiont was founded by fintech entrepreneur Mark Smith in 2013 as a platform that leverages blockchain technology to help financial institutions reduce risk, increase transparency and save costs inherent in complex transactions. Symbiont created "SmartLoans", the first smart contracts in the syndicated loan trading market that eliminate the need for third-party intervention in their use and implementation.

3.  Symbiont provides a range of services to its customers, which are financial institutions and exchanges (primarily Vanguard and NASDAQ). Primarily, the Company provides integrated solutions for the use of the Blockchain in recording corporate transactions.

4.  The Company's central platform is its Assembly product. Assembly is a blockchain platform for building and running decentralized applications, called "smart contracts," that meets the highest standards of security, integrity and availability for mission-critical use cases in financial services. Assembly uses state machine replication to provide strong consistency and data availability guarantees without sacrificing network decentralization or confidentiality. Assembly smart contracts are written in a domain-specific language designed for modeling the most complex business logic for a decentralized, digital golden record of financial transactions.

5.  The Company works directly with its partners to deliver custom applications using its proprietary infrastructure. Its operations facilitate the safety and security of its customers' transactions using the state of the art in blockchain technology.

6.  The Debtor is a typical venture-capital backed company. Its primary source of capital is through equity capital raises where it obtains investor capital. Its current equity capital

consists of; a series seed, A, A1, B, B1 investment rounds structured as convertible preferred stock. The Company has raised approximately $56M since founding.

7. As of the Petition Date, the Debtors' debt obligations include (i) $2.3 million of prepetition senior secured obligations owing to LMF and (ii) $2.3 million of prepetition unsecured debt to its PEO and trade creditors.

8. The software industry is constantly evolving at a rapid pace due to, among other things, deregulation, privatization, consolidation, technological advancements, availability of alternative services from competitors, and ever-changing consumer desires. A leading-edge technology company's financial results are highly dependent upon its ability to anticipate, assess, and adapt to rapid technological changes and consumer desires so that it may offer, on a timely and cost-effective basis, services that meet evolving industry standards at competitive prices.

9. The Company recognized that a growing market was forming for a comprehensive blockchain-enabled platform, capable of hosting recording and implementing financial transactions through electronic mediums in a safe manner. Symbiont is on the cutting edge of this technology and invested heavily in building its Assembly platform.

10. To stay on the leading edge, the Company's business model demanded constant investment in research and development of its technology and the retention of sophisticated software engineers who could provide relevant and competitive services to Symbiont and its customers. In addition to funding the costs of research and development for its platform, the Company's business model required it to expend capital on corporate administration.

11. To become cash flow positive and reach profitability, the Company's business model required the Company to complete its architecture and then scale its services to a significantly larger worldwide customer base. While the Company has made significant inroads

at reaching the necessary scale, it was not able to reach a scale sufficient to reach profitability, due in part to litigation and the early stage of understanding surrounding blockchain technology.

12. However, the Company has, traditionally, been very successful in raising capital through equity raise transactions. Where the Company could not raise outside capital, it would fund operations through a series of loans provided by insiders. For example, Mark Smith lent the company $800,000 and Director Duncan Neideraue lent $200,000 in early 2021 to permit the Company to make payroll. Upon receipt of an equity investment, the Company would repay these bridge loans.

13. In 2021, the Company was introduced to LMF. LMF pitched itself as a sophisticated capital provider that was looking for value-based investments. As LMF told the Company and its representatives during their initial meetings, LMF could not afford a "unicorn" investment, but it could afford a "skinny horse" that with some food could turn into a unicorn.

14. LMF proposed that it would facilitate ethe Company consummating a SPAC transaction. Through this transaction, LMF would purchase all the outstanding equity in the Company through a Special Purposes Acquisition Company, or SPAC. The SPAC was already listed on a public exchange, and therefore the transaction was an easy way for the Company to "go public" without the time necessary for the Company to consummate its own IPO.

15. LMF and the Company worked together to document the SPAC transaction, and in furtherance thereof the Company agreed to an "exclusive" agreement, that prevented the Company from exploring other capital alternatives during the pendency of the negotiations of the SPAC transaction.

16. In connection therewith, LMF provided the Company with a secured loan for $2.3 million to fund payroll and other operational obligations while the SPAC was pending. The parties

4

understood that the loan would be repaid using the proceeds from the SPAC transaction. The Company, however, did not anticipate that the loan and SPAC were little more than subterfuge in order for LMF to attempt to wrest control of the Company's key assets for a considerable discount.

17. The issues began in April of 2022 when LMF informed the Company that it would no longer be consummating the SPAC transaction. This left the Company in a difficult position as LMF's exclusive period to purchase the Company had not yet expired. As such, the Company was unable to negotiate for or seek a different SPAC sponsor until LMF exclusivity period ended.

18. The Company engaged Perella and began diligently searching for a replacement transaction. The Company entered into negotiations with numerous potential counterparties, reducing the number to three counterparties. The Company began outlining potential commercial transactions and had circulated a term sheet to each of them. Predictably, the Company was unable to line up a replacement transaction prior to the maturity date of the LMF loan transaction. The Company immediately sough to negotiate for a brief forbearance period – the Company was hopeful that three to five weeks would be sufficient to consummate the transaction.

19. LMF, however, had other idea. Having choked the Company's liquidity by pulling away the SPAC transaction and simultaneously shortening the runway for the Company to obtain additional financing, LMF proceeded to demand extortionate terms for a brief forbearance – including forbearance fees of over 25% of the principal amount of the debt, a waiver of all challenged to any Article 3 sale that LMF may attempt, and a "bill of sale" in a box. These terms would have effectively ceded control of the Company and its valuable assets to its secured lender on the eve of a transaction that would have permitted material growth. The transactions were not the product of a good faith request by a lender, but a mere attempt to beat the skinny horse into submission.

5

20.     The Company could not permit LMF to use a default to obtain access to either the source code for Assembly, its customer list, or its key employees. Faced with a growing liquidity crunch, vendors that were unpaid, and a secured lender on the doorstep, the Company and the Board consulted with its legal and financial advisors regarding the various options available to the Company for financial reorganization under the laws of the many jurisdictions in which the Company operates or has property.

21.     On December 1, 2022 (the "Petition Date"), the Debtor filed a Voluntary Petition for relief under Chapter 11 of title 11 of the United States Code ("Bankruptcy Code").

22.     The Debtor originally intended to use the breathing room afforded by the bankruptcy filing to consummate a refinancing transaction that would inject capital needed to continue the Debtors' operations during the course of the chapter 11, and then either complete a larger equity transaction or sell the debtor's business through a confirmed plan of reorganization. Indeed, on the Petition Date, the Debtor had two term sheets for financing and was in discussions with other on a larger transaction. The Debtor had every understanding and belief that if it filed by the Petition Date, its financing would come through and the Debtor would be able to meaningfully engage in the chapter 11 process.

23.     Unfortunately, the Debtor has not, as of yet, been able to consummate any transactions. The Debtor does not have cash to continue its operations in its current form and cannot make all payments of post-petition obligations as required by the Bankruptcy Code. The Debtor's management remains in discussions with potential counterparties regarding a transaction that would right the proverbial ship and provide the Debtor with the runway needed to not only survive, but to thrive. However, given that the Debtor's secured creditor has a pending motion for stay relief, and the Debtor cannot opine on the realistic time to close its transaction, the Debtor

6

believes that the best interests of the Debtor and all parties is to dismiss this case and continue outside of chapter 11.

## JURISDICTION AND VENUE

24. This Court has jurisdiction over this case and this Application pursuant to 28 U.S.C. §§ 157 and 1334, and the Standing Order of Referral of Cases to Bankruptcy Judges.

25. Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of this motion is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for this motion are § 1112(b) of the Bankruptcy Code and Bankruptcy Rule 1017.

## DISCUSSION

26. By way of this Application, the Debtor respectfully seeks an Order dismissing this Chapter 11 case. A request for dismissal of a Chapter 11 case is governed by § 1112(b) of the Bankruptcy Code, which provides, in pertinent part, that:

> (b)(1) … after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.
>
> \*\*\*
>
> (4) For purposes of this subsection, the term "cause" includes – substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation 11 U.S.C. § 1112(b)(4).

27. Section 1112(b) of the Bankruptcy Code requires the court to conduct the following two-part analysis in determining whether to dismiss a Chapter 11 case. First, as a threshold matter, the court must determine whether cause for dismissal exists; and second, if cause is found, the court must then decide whether it is in the best interests of creditors to simply dismiss the case or to convert it to a chapter 7 case. *In re Hampton Hotel Investors, L.P.,* 270 B.R. 346, 358-59 (S.D.N.Y. 2001).

28.     It is well settled that a finding of "cause" is a matter of judicial discretion to be determined on a case-by-case basis. *Id.; In re Adbrite Corp.,* 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003); *In re Court Living Corp.,* 1996 U.S. Dist. LEXIS 13588, *9 (S.D.N.Y. 1996). A bankruptcy judge has a tremendous amount of discretion upon engaging in its determination of whether the requisite cause exists to dismiss a Chapter 11 case. *In re Roma Group, Inc.,* 165 B.R. 779, 781 (S.D.N.Y 1994); *In re Reichert,* 138 B.R. 522 (Bankr. W.D. Mich. 1992). In keeping with the same, the Court in *In re HBA East, Inc.,* 87 B.R. 248 (Bankr. E.D.N.Y 1988), stated:

> The precise perimeters of "cause" are intentionally omitted from the statute so as to afford maximum flexibility and, among other things, to enable a bankruptcy court to dismiss a Chapter 11 case for any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy reorganization process.

87 B.R. at 258.

29.     Here, there is cause to dismiss the case. As LMF contends in their motion for relief from the stay, the Debtor presently has no cash and as of the time of the making of this motion, the Debtor has not consummated a transaction with any potential source of financing for this case. As such, each day that the case is permitted to continue deepens the administrative burden faced by this Debtor. In the absence of financing, the Debtor cannot pay employees, cannot pay creditors providing services post-petition, and cannot afford to pay United States Trustee fees – all of which are required by the Bankruptcy Code. The Debtor is a melting ice cube lacking the ability to generate enough cold to hold itself together.

30.     Moreover, LMF, the Debtor's secured creditor, has sought stay relief to begin its process of foreclosing on the Debtor's assets. Leaving aside any defenses to that foreclosure the Debtor may have – and notwithstanding LMF's counsel's one-sided re-telling of a settlement conversation, the Debtor intends to defend itself from any precipitous foreclosure that is not

8

commercially reasonable – if LMF's motion is granted, the Debtor would be forced to proceed to state court or be left in this case without any assets to reorganize around. As such, for all the reasons complained of by LMF in its motion, the case should be dismissed.

31.     Similarly, dismissal is in the best interests of creditors. The "best interests of creditors" is not defined in the Bankruptcy Code and is a matter committed to the discretion of the court requiring consideration of the "totality of facts and circumstances of the individual case." *Hampton Hotel*, 27 B.R. at 359. In conducting this analysis, the court evaluates the alternatives and chooses the one that would be most advantageous to the estate as a whole. *Id.* Any or all of the following factors are relevant in determining whether conversion or dismissal is in the "best interests of creditors":

  i. whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal;

  ii. whether there would be a loss of rights granted in the case if it were dismissed rather than converted;

  iii. whether the debtor would simply file a further case upon dismissal;
  the ability of the trustee in a Chapter 7 case to reach assets for the benefit of creditors;

  iv. in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise;

  v. whether any remaining issues would be better resolved outside the bankruptcy forum;

  vi. whether the estate consists of a single asset; and

  vii. whether the debtor had engaged in misconduct and whether creditors are in need of a Chapter 7 case to protect their interests.

*Id.* (citing 7 Lawrence P. King, *et al., Collier on Bankruptcy,* P. 1112.04(6) (15th ed. revised 2006).

32.     Here, the best interests of creditors are served by dismissal. Creditors' best chance of repayment remains with the Debtor consummating a transaction that includes the injection of

9

capital sufficient to repay LMF and to continue operations. Conversion of this case would require a chapter 7 trustee to cease all operations and as a result would end discussions that remain ongoing even as the Debtor files this motion. The Debtor's asset here is source code – a platform for operations on the block chain – and the Debtor is in the best position to unlock this value for all creditors.

33. Moreover, LMF, the Debtor's sole secured creditor has brought a motion for stay relief in order to proceed to foreclose on and, if successful, seize all the Debtor's assets. Conversion of this case would require a chapter 7 trustee to attempt to monetize those assets (i.e., sell the source code) or simply turn it over to LMF, who also lack the ability to monetize it for all creditors. Moreover, conversion would all but eliminate any potential claims the Debtor has arising from LMF's bait and switch tactics surrounding the SPAC transaction – all of which provide for additional value to creditors and potentially equity holders.

34. This is a difficult case. The Debtor commenced this chapter 11 to preserve its going concern value in face of a cash crisis and liquidity issues, all of which stem from its secured creditor abandoning a transaction and leaving the Debtor with impossibly small runway to find a replacement transaction. The Debtor believed that financing was there, and it unfortunately was not. Had the parties that committed to provide financing to this case come through, the case would be in a radically different position; however, the Debtor is where it is and must look towards the future.

35. Conversion of this case would give the Debtor's assets to the very creditor who facilitated the Debtor's liquidity issues. Dismissal of this case at this time would preserve whatever value remains in the Debtor, permit the Debtor to attempt to finalize a refinancing transaction, and provide the Debtor with an opportunity to meaningfully challenge LMF's precipitous foreclosure

10

tactics.

## **NOTICE**

36.     Notice of this Application has been served upon: (a) the United States Trustee; (b) all creditors of the Debtors; and (c) all parties who have filed with the Court a request for notice in this Chapter 11 case.  The Debtor respectfully submits that no other or further service or notice is necessary or appropriate.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

## **CONCLUSION**

37.     Based upon the foregoing, the Debtor respectfully requests than an Order be entered, pursuant to § 1112(b) of the Bankruptcy Code, dismissing this Chapter 11 proceeding and granting such and other and further relief as this Court deems just and proper.

Dated: New York, New York
December 28, 2022

Respectfully Submitted,

By:     /s/ Lawrence F. Morrison
Lawrence F. Morrison
Morrison Tenenbaum PLLC
87 Walker Street, Second Floor
New York, New York 10013
Tel: (212) 620-0938
Fax: (646) 390-5095