

ATTORNEYS AT LAW
90 PARK AVENUE
NEW YORK, NY 10016-1314
212.682.7474 TEL
212.687.2329 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
212.338.3496
kcatanese@foley.com

CLIENT/MATTER NUMBER
098929-0117

February 14, 2023

Hon. Philip Bentley
U.S. Bankruptcy Court, Southern District of
New York
One Bowling Green, Courtroom 601
New York, NY 10004

   Re: *In re Symbiont.io, LLC*
     Case No. 22-11620 (PB)

Dear Judge Bentley,

  We write as a status update to our chambers conference (the "Conference") in this matter. There have been numerous recent developments that further add to LM Funding's distrust of Debtor's conduct and management of this case as debtor in possession. LM Funding recently learned that Debtor has potential executory contracts with Morse Labs, Inc. ("Morse"), the same potential buyer that Debtor has been negotiating with, that Debtor did not schedule, disclose to this Court or otherwise provide for treatment in this Case that directly and negatively impact LM Funding's collateral.

  The Summary Heads of Agreement, the Symbiont Helios Morse License Agreement, the Symbiont Helios Morse Services Agreement, and the Symbiont Helios Morse Services Description (collectively, the "Contracts")[1] outline a collaboration between Symbiont.io, Inc. (Debtor's predecessor) and Morse beginning February 2, 2022 (the "Effective Date"), which was nine months prior to this bankruptcy filing, continuing for three years and automatically renewable. The Contracts discuss Debtor's blockchain-based enterprise software platform ("Assembly Software") that utilizes smart contract technology for engaging in different types of business transactions. Through the Contracts, Morse seeks to utilize the Assembly Software to create a product for the development and commercialization of an alternative automated fund transfer system using blockchain and smart contract technology targeting banks and financial institutions (the "Product").

  By the Contracts, Debtor entered into a license with Morse to provide the Assembly Software, as well as provide for its support and maintenance, to Morse, with possible rights to exclusively utilize Assembly.[2] Additionally, the Contracts state that Debtor will provide to Morse certain services related

---

[1] Defined terms not otherwise defined herein shall have the meanings ascribed in the Contracts.

[2] The Contracts are inconsistent regarding whether Morse has the exclusive right to utilize Assembly. *Cf.* "with rights to exclusively utilize Assembly for the Business Purpose" (Symbiont Helios Morse Summary of Heads of Agreement at

| | | | | |
|---|---|---|---|---|
| AUSTIN | DETROIT | MEXICO CITY | SACRAMENTO | TALLAHASSEE |
| BOSTON | HOUSTON | MIAMI | SALT LAKE CITY | TAMPA |
| CHICAGO | JACKSONVILLE | MILWAUKEE | SAN DIEGO | WASHINGTON, D.C. |
| DALLAS | LOS ANGELES | NEW YORK | SAN FRANCISCO | BRUSSELS |
| DENVER | MADISON | ORLANDO | SILICON VALLEY | TOKYO |

4874-1504-6480.6



Hon. Philip Bentley
February 14, 2023
Page 2

to the development and creation of certain technology associate with the Product, for which Debtor will assign rights to Morse, including the assignment to Morse of all Intellectual Property Rights to software developed by Debtor for the Product, using its Assembly Software.

As consideration for the Contracts, *inter alia*, Morse paid Debtor a one-time license "Prototype Fee" equal to $250,000 that was accepted as of the Effective Date. Additionally, within 5 business days following Debtor's delivery of the "MVP" product to Morse, Morse is supposed to pay Debtor a one-time license fee equal to $1,250,000, which was supposed to be paid no later than December 31, 2022. To date, it does not appear that Morse has made any such payment.

Additionally, section 9.5 of the License Agreement contemplates that following its execution, and not to exceed 90 days after delivery by Debtor of the MVP product, Debtor would deliver all Assembly Software, including the complete Source Code and any/all components for the operation, maintenance, modification, support and exploitation of the Assembly Software. Per the terms of this section, Morse is entitled to the release of the escrow if Debtor becomes insolvent, files for bankruptcy, makes an assignment for the benefit of creditors, or allows for the appointment of receiver. This section is particularly worrisome for LM Funding as it calls into question whether LM Funding's Collateral is adequately protected as promised by Debtor on the record.

As this Court is aware, Debtor granted LM Funding a security interest in all of Debtor's right, title and interest in Debtor's property and assets.[3] Debtor's schedules list the Assembly Software as its largest, and possibly only, asset with value. Through these Contracts, Debtor is transferring LM Funding's Collateral without its consent. LM Funding is extremely concerned that its Collateral is not being adequately protected given what LM Funding has uncovered regarding the Morse Contracts. Although Debtor testified at the section 341 meeting of creditors that the source codes and other intellectual property were being maintained, LM Funding has received no proof of this and seeks to ensure that all of Debtor's intellectual property is being protected, including the information contained on the Debtor's GitHub account, its coding collaborative platform Notion, Google Drive, and Google Mail, as well as all channels of the Debtor's internal messaging platform, Slack. Also, Section 9.5 of the License Agreement indicates that LM Funding's Collateral may already be out of reach and sitting in an escrow account available for Morse to release at any time.

At the January 10, 2023 hearing on the Lift Stay Motion, Debtor stated LM Funding was adequately protected because within a few days after that hearing, Debtor would be receiving two (2) deposits from certain accounts receivable that would be deposited into the Debtor's DIP account. To

---

section 1.2.1.) with "grants to Client, a perpetual, irrevocable … non-exclusive … right and license to the [Assembly] Software" (Symbiont Helios Morse License Agreement at section 2).

[3] Excluding the settlement proceeds of the *Ipreo* litigation, as discussed in the Lift Stay Motion.



date, LM Funding has only received proof of one (1) deposit, in the amount of $121,079.59 from SWIFT. This is simply not adequate protection when LM Funding is owed well over $2 million.

Debtor's failure to disclose the Contracts and its lack of clarity regarding whether LM Funding is adequately protected is alarming. Indeed, even if the effect of the Contracts and the software escrow is that the Assembly Software is simply duplicated for Morse's benefit, the existence of the Contracts call into question whether there is a diminution in value of the Debtor's assets. It further calls into question whether Morse Labs, as a potential post-petition buyer, is legitimate.

LM Funding has also learned that it appears that one of the members of Debtor's board is also an insider of Morse Labs, exposing a conflict of interest that LM Funding was not aware of and was not disclosed by Debtor.

Moreover, upon information and belief, it appears LM Funding has been granted access to a dummy data room. Debtor's counsel indicated that LM Funding would be provided access to the data room that was created by the investment banker in this case, which was provided to potential buyers to evaluate a purchase of Debtor's assets. Debtor's counsel provided access, and, upon a review of the data room, it appears that there are substantial documents missing that would customarily be included in a data room of this type, including monthly financials (balance sheets and income statements), employee information,[4] key intellectual property information including access to the Debtor's Google Drive and GitHub account[5]. Information concerning LM Funding's Note is also missing. It is highly unlikely that a potential buyer would not be provided this key information, and yet it was stripped from the data room that LM Funding was provided access to.

Additionally, it appears that all of the documents in the data room LM Funding was given access to were created or uploaded on February 3, 2023. LM Funding's request was access to the data room that was created many months ago for potential buyers—however, this room was created only a two weeks ago.

In addition to the issues with the Morse Contracts there are some concerns with respect to other contracts found in the data room LM Funding was given access to:

- Document 7.1.1_Symbiont Services Addendum. Section 18, Compliance with Law, references Section 9.3, which is an addendum to the agreement with Citibank, seems to entitle Citibank to a complete duplication of intellectual property in the event of a bankruptcy filing by Debtor;

---

[4] It is LM Funding's understanding that the investor data room contained extensive employee information.

[5] This is where the coding for Debtor's platform is housed.


Hon. Philip Bentley
February 14, 2023
Page 4

- Document 7.1.2_Symbiont Master Software and License Agreement. Sections 3.1 and 3.3 seem to again give Citibank a duplicate of all source code in the event of bankruptcy. This IP makes up LM Funding's Collateral;

- Document 7.4.1 Symbiont Vanguard. This document has a similar bankruptcy trigger clause with respect to LM Funding's Collateral and has a similar software escrow agreement as the Morse Contracts. The original agreement here appears to be from 2018—years prior to LM Funding's Note and never disclosed to LM Funding.

As a result of Debtor's continued failure to make disclosures to this Court and to LM Funding, despite statements on the record to the contrary, LM Funding is preparing a Rule 2004 motion to compel production of those documents missing from the data room and subpoena information regarding the Contracts. These developments, coupled with Debtor's complete lack of transparency to this Court and LM Funding, as well as the issues raised in the Lift Stay Motion, support that an independent party must be completely in control of Debtor. As a result, in addition to its Rule 2004 motion, LM Funding will be moving to convert this case to a Chapter 7 bankruptcy so that a trustee may be appointed to take control and marshal assets. LM Funding did discuss these issues with Debtor's counsel who indicated that it would be following up with Debtor, but, to date, we have not heard back regarding any of the above.

LM Funding also requests that this Court enter its Order granting its Lift Stay Motion, which was granted per the terms of the Stipulation and the January 26, 2023 status conference and was filed on the docket on January 26, 2023 at docket no. 30.

Please let us know if you have any questions or if you require anything further.

Respectfully submitted,

/s/ *Katherine R. Catanese*

Katherine R. Catanese

cc: United States Trustee
R. Dakis
L. Morrison
AttachmentsEnclosures

4874-1504-6480.6